UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| DOMENIC DOVER | ) | CASE NO.: |
| % THE LAW OFFICE OF PAUL J. | ) | |
| CRISTALLO | ) | JUDGE: |
| 4403 ST. CLAIR AVE. | ) | |
| CLEVELAND, OH 44103 | ) | **COMPLAINT** |
| | ) | |
| | ) | |
| | ) | **(Jury Demand Endorsed Hereon)** |
| Plaintiff | ) | |
| | ) | |
| -vs- | ) | |
| | ) | |
| CUYAHOGA COUNTY | ) | |
| 2079 East Ninth Street | ) | |
| Cleveland, Ohio 44115 | ) | |
| | ) | |
| and | ) | |
| | ) | |
| ARMOND BUDISH(in his official capacity) | ) | |
| KENNETH MILLS (in his official capacity) | ) | |
| RHONDA GIBSON (in her official capacity) | ) | |
| ERIC J. IVEY (in his official capacity) | ) | |
| DR. THOMAS TALLMAN (in his official | ) | |
| capacity) | ) | |
| CPL. BRAD BITTERMAN | ) | |
| DEPUTY STACEY JARRELL | ) | |
| C.O. DJUNA GOSHAY | ) | |
| C.O. HAINES | ) | |
| C.O. JOSEPH JOHNSON | ) | |
| CPL. WILLIAM JORDAN | ) | |
| SGT. JOE KELLY | ) | |
| C.O. WILLIAM WACASEY | ) | |
| C.O. CRAIG HARRIS | ) | |

```
C.O. MICHAEL SHAW                         )
BOOKING OFFICER "SHRXI"                   )
NURSE SHAMARMA REEVES                     )
NURSE FELICITY WHITE                      )
NURSE STEPHANIE SOUCIE                    )
NURSE TAMMIE NEWSOME                      )
NURSE RHONDA THOMAS                       )
NURSE JESSICA ROBLES                      )
NURSE LEMEMIER                            )
JOHN AND JANE DOES 1-10                   )
(all in their individual and official capacities )
unless otherwise noted)                   )
% THE CUYAHOGA COUNTY JAIL                )
1215 WEST 3RD STREET                      )
CLEVELAND, OHIO, 44113                    )
                                          )
and                                       )
                                          )
                                          )
THE METROHEALTH SYSTEM                    )
2500 Metrohealth Drive                    )
Cleveland, Ohio  44109                    )
                                          )
                                          )
              Defendants                  )
```

## **INTRODUCTION**

1.      This civil rights action arises out of the preventable attempted suicide of Domenic Dover.  Mr. Dover had mental health issues and a history of self-harm, all of which were ignored.  Mr. Dover was not provided adequate medical care, nor was he properly evaluated.  Despite the fact that Mr. Dover made Cuyahoga County Jail staff and MetroHealth medical personnel aware that he was suicidal, Mr. Dover was still given a blanket and a cell with a mechanism upon which he could, and did, attempt to end his life.  Following Mr. Dover's suicide attempt, he

was taken to MetroHealth Hospital in Cleveland, Ohio where he remained in a coma for several days. As a direct result of the defendants acts, omissions, failures and misdeeds, Mr. Dover seeks compensatory and punitive damages, costs and all other relief for which he may be entitled.

**JURISDICTION AND VENUE**

2.     The Jurisdiction of the Court is invoked pursuant to the Civil Rights Act, 42 U.S.C. § 1983 *et seq*; 42 U.S.C. § 12131 (the "Americans with Disabilities Act"); the Judicial Code, §§ 1331 and 1343(a); §504 of the Rehabilitation Act of 1973 (§504); and the Constitution of the United States.

3.     Venue in this Court is proper as the parties reside, or at the time the events took place, resided in Cuyahoga County, and the events giving rise to the Plaintiff's claims also occurred in Cuyahoga County.

**PARTIES**

4.     Plaintiff Domenic Dover is, and was at all times relevant, a resident of the State of Ohio and Cuyahoga County.

5.     The Cuyahoga County Correctional Center ("CCCC") is the Cuyahoga County Jail, a correctional facility owned and operated by Cuyahoga County, with its principal place of business located at 1215 W. 3rd Street, Cleveland, Ohio, 44113.

6.     Defendant Cuyahoga County is, and was at all times relevant, a political subdivision and unit of local government duly organized under the laws of the State of Ohio. Defendant Cuyahoga County is a political subdivision/entity and is

a "person" subject to being sued pursuant to 42 U.S.C. §1983. Defendant Cuyahoga County is or was the employer and/or principal of the other named defendants.

7.     Defendant Budish is the Cuyahoga County Executive. Defendant Budish is a "person" under 42 U.S.C. § 1983. At all times relevant to this case, Defendant Budish was responsible for the CCCC's operation, acted within the course and scope of his employment, and acted under the color of law. Defendant Budish was responsible for CCCC's policies, procedures, practices, customs as well as the training and supervision of agents, servants, and employees of the CCCC. Defendant Budish had policy making and/or final policy making authority for the CCCC and is sued in his individual and official capacity.

8.     Defendant Mills was the former Director of the CCCC, prior to Mr. Dover's incarceration. Defendant Mills is a "person" under 42 U.S.C. § 1983. At all times relevant to this case, the policies and procedures implemented by Defendant Mills while he was the Director of the CCCC were in effect at the time of Mr. Dover's incarceration in July, 2019. The implementation of unconstitutional and unlawful policies were within the scope of his employment, and he acted under the color of law. Defendant Mills was also responsible for CCCC's policies, procedures, practices, customs as well as the training and supervision of agents, servants, and employees of the CCCC while he was the Director. His policies, procedures, practices, customs as well as his training and supervision policies became the official polices, practices and customs of the

CCCC and continued following his departure. Defendant Mills had policy making and/or final policy making authority for the CCCC and is sued in his official capacity.

9.     Defendant Gibson was at all relevant times the Director of the CCCC. Defendant Gibson is a "person" under 42 U.S.C. § 1983. At all times relevant to this case, Defendant Gibson was also responsible for the CCCC's operation, acted within the scope of his employment, and acted under the color of law. Defendant Gibson was also responsible for CCCC's policies, procedures, practices, customs as well as the training and supervision of agents, servants, and employees of the CCCC. Defendant Gibson had policy making and/or final policy making authority for the CCCC and is sued in her official capacity.

10.     Defendant Ivey was the Warden of the CCCC. Defendant Ivey is a "person" under 42 U.S.C. § 1983. At all times relevant to this case, Defendant Ivey was also responsible for the CCCC's operation, acted within the scope of his employment, and acted under the color of law. Defendant Ivey was also responsible for CCCC's policies, procedures, practices, customs as well as the training and supervision of agents, servants, and employees of the CCCC. Defendant Ivey had policy making and/or final policy making authority for the CCCC and is sued in his official capacity.

11.     Defendant Dr. Thomas Tallman was the Director of Correctional Medicine and/or the CCCC's Medical Director. Defendant Dr. Tallman is a "person" under 42 U.S.C. § 1983. At all times relevant to this case, Defendant Dr. Tallman was

also responsible for the CCCC's operation, acted within the scope of his employment, and acted under the color of law. Defendant Dr. Tallman was also responsible for CCCC's policies, procedures, practices, customs as well as the training and supervision of agents, servants, and employees of the CCCC. Defendant Dr. Tallman had policy making and/or final policy making authority for the CCCC and is sued in his official capacity.

12.     Defendant MetroHealth System ("Defendant MetroHealth") was and is a political subdivision and unit of local government duly organized under the laws of the State of Ohio, and/or is a non-profit public health care system located in Cleveland, Ohio, and is a "person" under 42 U.S.C. § 1983. Defendant Cuyahoga County contracts with MetroHealth to oversee and provide medical, nursing, and mental health services at the CCCC. Defendant MetroHealth operated at all times relevant herein under the color of law and was responsible for the policies, procedures, practices, customs as well as the training and supervision of agents, servants, and employees of the CCCC. Defendant MetroHealth, by and through its officers, employees and agents, had policy making and/or final policy making authority for the CCCC.

13.     Defendant Brad Bitterman was at all times relevant herein a corporal at the CCCC. Defendant Bitterman is a "person" under 42 U.S.C. § 1983. At all times relevant to this case, Defendant Bitterman was also responsible for the CCCC's operation, acted within the scope of his employment, and acted under the color of law. Defendant Bitterman bore some responsibility for CCCC's policies,

procedures, practices, customs as well as the training and supervision of agents, servants, and employees of the CCCC. Defendant Bitterman had some policy making and/or final policy making authority for the CCCC and is sued in his individual and official capacity.

14.     Defendants Jarrell, Goshay, Haines, Johnson, Jordan, Kelly, Shaw, Wacasey, Harris, and the booking officer who performed the pre-booking and booking of Mr. Dover into the CCCC on July 5, 2019 at approximately 2:20 pm (See, Intake Form, attached hereto as Exhibit 1") and is identified on Exhibit 1 as SHRXI, were all employees, agents or otherwise acting on behalf of Cuyahoga County. At all times relevant, these Defendants were acting within the scope of their employment and under color of law. These Defendants are "persons" under 42 U.S.C. § 1983. These Defendants are sued in there individual and official capacities.

15.     Defendants Reeves, Bremer, White, Soucie, Newsome, Lememier, Thomas, and Robles were all employees, agents or otherwise acting on behalf of Cuyahoga County. At all times relevant, these Defendants were acting within the scope of their employment and under color of law. These Defendants are "persons" under 42 U.S.C. § 1983. These Defendants are sued in there individual and official capacities.

16.     John and Jane Does 1-10 are those individuals and entities whom, at all times relevant herein were employees, agents or acting on behalf of Defendant Cuyahoga County and/or Defendant MetroHealth or were acting under the

supervision, agency and/or authority of Defendant Cuyahoga County and/or Defendant MetroHealth. These Defendants are each a "person" under 42 U.S.C. § 1983. At all times relevant to this case, these Defendants acted within the scope of their employment and acted under the color of law. These Defendants are each sued in their individual and official capacity.

## FACTS

17.     On July 1, 2019, Plaintiff Domenic Dover was booked into the Cuyahoga County Correctional Center ("CCCC").

18.     Mr. Dover was arrested for an alleged probation violation stemming from a non-violent crime. Mr. Dover was a pre-trial detainee in that he was arrested and detained based on the allegation that he had violated the terms of his probation. A hearing as to whether or not Plaintiff had, infact, violated his probation and was therefore lawfully jailed in the CCCC was to take place on July 8, 2019. However, Plaintiff attempted suicide on or about July 5, 2019 and was thereafter released from Cuyahoga County's custody - three days before the hearing to determine whether or not he belonged in the CCCC. As such, Mr. Dover had not yet been afforded a hearing relative to the allegations against him and was not a prisoner.

19.     The staff and medical providers at the CCCC were either expressly made aware of Mr. Dover's history of mental health, his need for prescription medications, and his propensity and/or intention to commit self-harm.

20.     More specifically, Plaintiff was transported by and interacted with defendant Jarrell wherein he indicated, in addition to other statements, that he was a mental health consumer, his diagnoses, and that he was contemplating self-harm.   This same sentiment and information was expressed at intake to intake officer identified as "SHRXI", See Exhibit 1, attached hereto, as well as Nurses Reeves and Bremer, all of whom ignored Plaintiff's express statements about needing mental health services, his diagnoses, medications, an adequate health evaluation, other health care, and the need to be placed on the mental health pod.

21.     More specifically, Plaintiff informed these defendants of the following critical information:   He had approximately 15 prior suicide attempts over the course of his life up to that point, including an attempt earlier in 2019; he had previously been diagnosed with serious mental health conditions including but not limited to Traumatic Brain Disorder (T.B.I.), Severe Depressive Disorder, and Severe Anxiety Disorder; he was currently taking mental health medications, some on a very high dose, which included but were not limited to Doxepin, Lexapro, Wellbutrin, and that the failure to provide him with these medications would lead to severe withdrawal symptoms and an increased tendency to self harm and suicide; and that CCCC and/or MetroHealth should have his medical records which could substantiate much of not all of these facts and concerns.

22.     Plaintiff was also subject to discipline on July 1, 2019 in the CCCC which included being taken to isolation.   Prior to being taken to isolation, Plaintiff was objecting to a housing assignment because he had not been properly evaluated,

and his mental health and other health concerns were being ignored. Plaintiff informed Reeves, Bremer, Harris, SHRXI and Jarrell that he needed to be placed on the mental health floor because of his diagnoses/pre-existing conditions and health concerns which included a concern relative to decompensation and self-harm, but his concerns were ignored. Again, Plaintiff specifically informed these defendants of the following critical information: He had approximately 15 prior suicide attempts over the course of his life up to that point, including an attempt earlier in 2019; he had previously been diagnosed with serious mental health conditions including but not limited to Traumatic Brain Disorder (T.B.I.), Severe Depressive Disorder, and Severe Anxiety Disorder; he was currently taking mental health medications, some on a very high dose, which included but were not limited to Doxepin, Lexapro, Wellbutrin, and that the failure to provide him with these medications would lead to severe withdrawal symptoms and an increased tendency to self harm and suicide; and that CCCC and/or MetroHealth should have his medical records which could substantiate much of not all of these facts and concerns. Rather, defendant Harris put Plaintiff in handcuffs and subjected him to punishment. A nurse identified in the records provided as "RN Lememier" was made aware of the foregoing by Plaintiff but Plaintiff was again ignored.

23. Plaintiff did not deserve to be disciplined and placed in isolation. Plaintiff was insisting that his mental health conditions and concerns be addressed and they weren't being taken seriously or properly addressed. Plaintiff complained to

those C.O.s who were on duty during the course of his confinement in isolation but to no avail. On or about July 2, 2019 Plaintiff voiced these same concerns regarding his diagnoses, his mental and physical health concerns and his propensity for self-harm (Plaintiff informed these defendants he had approximately 15 prior suicide attempts over the course of his life up to that point, including an attempt earlier in 2019; he had previously been diagnosed with serious mental health conditions including but not limited to Traumatic Brain Disorder (T.B.I.), Severe Depressive Disorder, and Severe Anxiety Disorder; he was currently taking mental health medications, some on a very high dose, which included but were not limited to Doxepin, Lexapro, Wellbutrin, and that the failure to provide him with these medications would lead to severe withdrawal symptoms and an increased tendency to self harm and suicide; and that CCCC and/or MetroHealth should have his medical records which could substantiate much of not all of these facts and concerns) to Nurses White and Soucie, and again on July 3, 2019 to Nurse Newsome. Plaintiff's concerns and objectively serious medical needs were again ignored.

24.     On July 4, 2019, Plaintiff was in the throes of a mental health crisis. He had not been given proper mental health care or received physical health care. Defendant Shaw began to escort Plaintiff to a cell in general population with another inmate. Plaintiff again objected and insisted that he needed a mental health assessment and proper mental health care. Defendant Bitterman intervened with defendant Shaw and Plaintiff again expressed that he had serious mental

heath conditions and diagnoses, was having a mental health crisis, was not adequately medicated, and that he was going to harm himself, including but not limited to the fact that he was suicidal. Yet again, Plaintiff informed these defendants he had approximately 15 prior suicide attempts over the course of his life up to that point, including an attempt earlier in 2019; he had previously been diagnosed with serious mental health conditions including but not limited to Traumatic Brain Disorder (T.B.I.), Severe Depressive Disorder, and Severe Anxiety Disorder; he was currently taking mental health medications, some on a very high dose, which included but were not limited to Doxepin, Lexapro, Wellbutrin, and that the failure to provide him with these medications would lead to severe withdrawal symptoms and an increased tendency to self harm and suicide; and that CCCC and/or MetroHealth should have his medical records which could substantiate much of not all of these facts and concerns. And again Plaintiff's statements were ignored. Plaintiff presented to Nurses Robles and Thomas in the midst of a mental health crisis. Plaintiff expressly all of the above critical facts to them. He explained that he was a mental health consumer, he again explained his pre-existing mental health diagnoses and conditions, that he was not being assessed or receiving any treatment for his conditions whatsoever. Plaintiff informed these defendants that he needed to see a mental health professional, needed mental and physical health care, he explained his pre-existing conditions and specific diagnoses, he told them about his medications and how he had been denied medication and was being forced to go "cold turkey",

and that as a result of all of these issues, he was suicidal. He also implored them to check his medical records to substantiate his statements. Despite Plaintiff repeatedly expressing that he was suicidal, needed mental and physical health care, and objectibely presented as someone in the midst of a mental and physical health crisis, Plaintiff was not evaluated and/or provided with any mental or physical health care. Rather, he was taken to a general population pod and cell rather than a mental health pod for housing and adequate observation. The complete and total disregard for Plaintiff's well-being caused him further distress and anguish. Plaintiff knew that he was decompensating and going through a mental health crisis and implored the defendants to provide him care, including but not limited to putting him in an environment where he could not harm himself, but he was not provided the care he needed.

25. Accordingly, Mr. Dover expressly made the Defendants aware of his pre-existing mental health diagnoses, his mental health crisis, the fact that he was not receiving mental health care or medications, he presented in a state of mental health crisis, he specifically informed the defendants that he was suicidal, and he repeatedly requested to be evaluated and placed in the mental health pod/floor for his own safety and well-being. These concerns were either ignored or treated as misbehavior.

26. Mr. Dover also made Defendants Goshay, Haines, Johnson, Jordan, Kelly, Wacasey aware of his need for medications, mental health services, and his propensity and/or intention to commit self-harm. Mr. Dover specifically and

repeatedly asked that he be assigned to the mental health pod. Mr. Dover also explained to the C.O.'s and Nurses named herein at the CCCC that he had previously been in the CCCC and was placed in a mental health pod based on his prior diagnoses and need for treatment. Accordingly, not only were MetroHealth and CCCC put on notice that Mr. Dover had mental and emotional issues that required medical attention, they were also made aware that he was previously assigned to the mental health pod for the same diagnoses and mental health issues from which he was again suffering.

27.     However, Mr. Dover was not properly evaluated, provided treatment or medications, segregated based on his mental health issues, or placed in an environment which included self-harm precautions.

28.     Further, Mr. Dover was put in isolation and not checked on. While in isolation, Mr. Dover again specifically and repeatedly asked that he be assigned to the mental health pod. Mr. Dover again explained that he had previously been placed in a mental health pod. While Mr. Dover was in isolation, the defendants were again put on notice that he had mental and emotional issues that required medical attention. The defendants were also made aware that he was previously assigned to the mental health pod for the same mental health issues from which he was again suffering. While in isolation, or "the hole", Mr. Dover repeatedly called out in a state of despair but his pleas were ignored.

29.     Having his medical needs ignored, as well as his pleas for help, on July 5, 2019, Mr. Dover took the blanket provided to him by CCCC and he used it to hang himself.

30.     Once Mr. Dover was discovered unconscious in his cell, he was taken to the MetroHealth Hospital in Cleveland, Ohio.  Thankfully Mr. Dover survived his suicide attempt but not before a lengthy and difficult stay at MetroHealth.  Indeed, Mr. Dover was in a coma for over a week following his suicide attempt and suffered mentally and physicall even after regaining consciousness.

31.     As a result of this incident, Mr. Dover endured pain, suffering, emotional distress, and other economic and non-economic losses.

## Evidence of Unconstitutional Customs, Policies, and Practices at the Cuyahoga County Jail

32.     Prior to Domenic Dover's suicide attempt, the U.S. Department of Justice, by and through the U.S. Marshals Office, conducted a thorough investigation and audit of the Cuyahoga County Jail.

33.     The final report of the U.S. Marshals' investigation, set forth herein through a link at paragraph 156 of Plaintiff's Complaint and fully incorporated herein, set forth various findings.   Some of those findings relative to the Cuyahoga County Jail included:

-       Cuyahoga County Jail staff failed to complete intake screenings in a timely manner;

-       Jail staff failed to report on health, safety, and security measures;

- Jail staff and inmates feared repercussions for speaking candidly to the U.S. Marshals investigators and U.S. Department of Justice agents;

- Comprehensive mental health appraisals were not conducted in a timely manner;

- There existed a backlog of "Kites" (requests by inmates for medical and/or mental health care);

- No information regarding the six (6) inmate deaths reported to the U.S. Marshals was maintained by the Warden's Office;

- The Cuyahoga County Jail's staff training curriculum does not consist of policy review and identifying and reporting signs of detainee/inmate mental health decomposition; and

- The denial of food, toilet paper and other essentials was used as a punitive measure against inmates. Inmates were told to use their clothing for toilet paper. Food was often withheld from prisoners, and they were not provided other basic staples like pens and paper.

34.    Prior to Domenic Dover's attempted suicide, the U.S. Department of Justice, by and through the U.S. Marshals Office, conducted a thorough investigation and audit of the Cuyahoga County Jail.

35.    Even more significantly, the U.S. Marshals team discovered the following

"SRT members who were escorting detainee/inmates to be interviewed by Facility Review Team members were referring to requested detainee/inmates as "Snitches," as they escorted them to and from the interview location. The threatening, intimidating, and aggressive behavior demonstrated and witnessed by the Facility Review Team resulted in the request to remove up to 10 detainee/inmates from the CCCC, for fear of SRT members retaliation, and the legitimate fear of detainee/inmate safety."

36.     It is significant and shocking that the Cuyahoga County Corrections Officers would intimidate witnesses who were part of a U.S. Department of Justice/U.S. Marshals' investigation.   Yet, it is almost incomprehensible that the Cuyahoga County Jail's staff were so brazen as to intimidate witnesses in front of and within earshot of these federal investigators.

37.     The same culture and perverse environment that would allow witness intimidation in front of the U.S. Marshals investigators is the same culture and environment that emboldened these Defendants to ignore Domenic Dover's medical emergency, and worse yet, to respond to his need for critical care.

38.     Further evidence of unconstitutional customs, policies, and/or practices within the Cuyahoga County Jail include those facts which form the basis for charging former Cuyahoga County Jail Warden Eric Ivey with felony charges for tampering with records and falsification.

39.     Defendant Warden Ivey ordered Cuyahoga County Corrections Officers to turn off their body cameras.  Ivey's actions, made in his official capacity and as a policy maker for Cuyahoga County, created an environment of corruption, neglect, and abuse.   By instituting such an offensive policy (eliminating the evidence of inmate abuse, neglect, and other criminal acts), Ivey all but guaranteed violations of the Constitution such as those suffered by Domenic Dover.

40.     In addition to the failings detailed in the U.S. Marshals Report, the unconstitutional policies, customs, and practices of the Cuyahoga County Jail are

evidenced by the copious number of shocking incidents, some of which are set forth as follows:

- **<u>Nicholas Colbert</u>**

National Guard Veteran Nicholas Colbert was admitted to the Cuyahoga County Jail following a lower level drug possession case. Nicholas battled drug addiction and had repeatedly committed time and effort to getting sober. Upon his admission to the Cuyahoga County Jail, his family was actually relieved because they believed he would be safe, off the streets, and not in harm's way. The Cuyahoga County Jail failed to perform a proper intake for Nicholas Colbert. They failed to provide him with an adequate screening and mental health evaluation. Just a few short hours after Nicholas Colbert was moved into a cell in a pod for Veterans, he hanged himself. Nicholas's death inexcusably occurred *after* the Cuyahoga County Jail officials had been given the scathing review and analysis from the U.S. Marshals relative to the substandard conditions at the Cuyahoga County Jail. Indeed, many of the exact same problems which were occurring in the Cuyahoga County jail, e.g., lack of training, lack of medical screening, an absence of mental health screening, a lack of suicide precautions and preventative measures, were those addressed by the U.S. Marshals. Similar to Mr. Dover, Nicholas Colbert's health conditions and medical needs were ignored and/or willfully disregarded. Nicholas Colbert also left behind a loving family.

- **<u>Esteben Parra</u>**

On June 23, 2018, Esteban Parra, a 32-year old son, brother, and father of two children, died while in the care and custody of Cuyahoga County. Esteben was experiencing drug toxicity and repeatedly asked for medical help. Esteben was objectively in a medical crisis and was wilfully ignored by officers, nurses, and doctors as his crisis mounted, and his suffering increased. Instead of treating his life-threatening condition, jail staff strapped Esteben to a restraint chair in a cruel gesture of disregard. Despite repeated grievances, obvious warnings, and a well-known history of abuse and horrible conditions within the Cuyahoga County jail, Esteben Parra senselessly lost his life. Cuyahoga County bears responsibility for the lack of medical attention required by law as well as the respect and human decency that Esteban deserved and should have received.

- **Joseph Arquillo**

On August 27, 2018, Mr. Arquillo was an inmate at the Cuyahoga County Corrections Center. Mr. Arguillo suffered a medical emergency while in the care and custody of Cuyahoga County. However, rather than provide Mr. Arquillo emergency medical assistance, a corrections officer came up to a prone Mr. Arquillo, kicked the mat he was lying on, and walked away. Other inmates called Mr. Arquillo's condition to the attention of other Cuyahoga County Jail staff, and their pleas were ignored. Mr. Arquillo died in the Cuyahoga County Jail.

- **Gregory Fox**

Gregory Fox, a 36-year-old man, was a pretrial detainee at the Cuyahoga County Jail in August 2018. Jail employees failed to provide Mr. Fox with necessary mental health care and medication and failed to take necessary steps to prevent his suicide. As a result, Mr. Fox committed suicide in his cell.

- **Brenden Kiekisz**

Brenden Kiekisz, a 27-year-old man, was a pretrial detainee at the Cuyahoga County Jail in December, 2018. Jail and MetroHealth employees also failed to provide Mr. Kiekisz with necessary mental health care despite being expressly informed that Mr. Kiekisz had mental health conditions, was on mental health medications, had a recent history of suicide, and was suicidal. The defendants in Mr. Kiekisz' case failed to take necessary steps to prevent his suicide. As a result, Mr. Kiekisz committed suicide in his cell.

- **Ms. Chantelle Glass**

Ms. Glass was taken into the Cuyahoga County Jail based on an old misdemeanor warrant out of New Jersey. Ms. Glass requested to call her family so they could find a lawyer to resolve this issue. The jail staff refused. In retaliation for repeatedly requesting to use the phone, Ms. Glass was assaulted and forced into a restraint chair, despite the fact that she was being compliant. Thereafter, Ms. Glass was violently struck and had an entire can of pepper spray emptied into her face, all while Ms. Glass was restrained. When Ms. Glass asked why she was maced, C.O. Clark responded, "Because you

talk too much." Similar to Domenic Dover, Ms. Glass was retaliated against and her medical needs were ignored.

- **<u>Mr. Joshua Castleberry</u>**

Mr. Castleberry snuck an extra bologna sandwich from the commissary with the intention of eating it in his cell. When he was caught, Mr. Castleberry threw the bologna sandwich at the corrections staff. In response, Corrections Officers John Wilson and Jason Jozwiak handcuffed Mr. Castleberry then savagely "smashed Mr. Castleberry's face so violently into the ground that his front teeth came out of his nose. They placed him in a restraint chair and jammed a mask over his broken face to conceal their assault from medical staff." Similar to Domenic Dover, Mr. Castleberry was treated in an unlawful manner and subsequently denied adequate medical care.

- **<u>Mr. Tyrone Hipps, Jr.</u>**

On November 1, 2018, Mr. Hipps, a Muslim inmate in the Cuyahoga County Jail, was interviewed by the U.S. Marshals Service Quality Assurance Review Team regarding the conditions in the Cuyahoga County Jail. Mr. Hipps provided information regarding the abuses and inhumane conditions inside the jail. Two days later, a Special Response Team (SRT) member, Officer Perdue, refused to let Mr. Hipps pray in an area and in a fashion where he had previously been allowed. In direct retaliation for providing information to the U.S. Marshals investigators, and in violation of Mr. Hipps' First and Fourteenth Amendment rights, Officer Perdue put Mr. Hipps in a chokehold

and slammed him headfirst into the ground.  Officer Perdue also altered his bodycam so as to prevent his abuse from being recorded.  Also similar to Mr. Dover, Mr. Hipps was further retaliated against by being placed in solitary confinement ("the hole"), and was also denied medical care.

- **Mr. Corrione Lawrence**

During the course of being processed into the Cuyahoga County Jail, Mr. Lawrence responded to questions in Spanish.  The booking officer and other jail staff decided that Mr. Lawrence was simply being difficult by responding in Spanish, so as punishment, they placed him in the restraint chair.  Mr. Lawrence was strapped down to a chair and forced to sit in a freezing cold room for approximately four (4) hours as punishment.  Thereafter, Mr. Lawrence was placed in a pod with his cousin's murderer, despite the fact that Mr. Lawrence specifically asked to be placed in any other pod except the one where this murderer was housed.  Mr. Lawrence feared he would be attacked. Not surprisingly, the man who murdered Mr. Lawrence's cousin attacked Mr. Lawrence, but he was never punished or brought to justice.  Rather, Mr. Lawrence was physically beaten by corrections officers and sustained serious injuries.  He was thereafter denied adequate medical attention. Mr. Lawrence was further retaliated against by being placed in isolation and was denied the ability to take a shower.

- **Mr. Glenn Mayer, Jr.**

Mr. Mayer suffered from a neurological condition which caused him to have involuntary spasms or "twitches." The staff at the Cuyahoga County Jail knew of Mr. Mayer's condition. While Mr. Mayer was being handed medication, he experienced a spasm. Corrections Officer Hayes witnessed this twitch and assaulted Mr. Mayer, squeezing his neck and slamming Mr. Mayer's elbow. The physical assault on Mr. Mayer went unpunished and Officer Hayes continued to harass and intimidate Mr. Mayer. Further, Mr. Mayer was denied adequate medical care despite an obvious need.

- **Mr. David Frunza**

Mr. Frunza was an inmate in the Cuyahoga County Jail who suffered from an epidural abscess and a spinal infection. Mr. Frunza's condition was obvious and objectively serious. Despite the seriousness of his conditions, the staff at the Cuyahoga County Jail failed to treat Mr. Frunza. As a result of the Cuyahoga County Jail staff failing to treat Mr. Frunza's serious medical condition, he suffered excruciating pain for approximately forty-two (42) days and now has permanent physical damage and emotional distress.

- **Ms. Tonya Clay, et al.**

On May 17, 2019, Ms. Tonya Clay and other Plaintiffs filed a lawsuit against Cuyahoga County and various other officials and individuals based on the inhumane conditions inside the Cuyahoga County Jail. Plaintiffs' Complaint details how Cuyahoga County has adopted customs, policies, and practices which are inhumane, pervasive, and unconstitutional. As a direct and

proximate result of these same unconstitutional customs, policies, and practices, Domenic Dover suffered physical injury, emotional distress, violations of his Constitutional rights, and other losses and damages.

41.     The aforementioned individuals all experienced a violation of their Constitutional rights, either as a result of abuse at the hands of corrections officers or were otherwise treated with deliberate indifference to a serious medical problem.

42.     However, the aforementioned incidents do not constitute an exhaustive list.    There have been other similar incidents of excessive force, the denial of medical care, and the neglect and abuse of inmates with mental health issues—all of which demonstrate an environment of unlawful policies, customs, and practices.

43.     Despite Defendants' knowledge of Domenic Dover's need for emergency medical care, they were deliberately and callously indifferent to his risk of more serious injury and death.

44.     The Defendants failed to offer or procure appropriate intervention and precautions for Domenic Dover's serious, immediate, and life-threatening conditions.

45.     Defendants jointly agreed and/or conspired with one another, and others, to complete false, misleading, and incomplete official reports and to give a false, misleading, and incomplete version of the events to certain superiors and the

public in order to cover up their own misconduct and failure to properly care for Domenic Dover.

46. All of the actions of the Defendants and their named and unnamed co-conspirators, as set forth above and below, were taken jointly, in concert, and with shared intent.

47. All Defendants had a duty to care for and protect Domenic Dover while he was in their custody, and they failed to do so.

48. Defendants were deliberately indifferent to protecting Domenic Dover from harm and failed to prevent said harm; furthermore, they failed to provide urgently needed medical and other health care. Their conduct was unreasonable in failing to protect Domenic Dover from harm.

49. Upon information and belief, no correctional officer, medical provider, or other Cuyahoga County Corrections Center employee has been disciplined in any way as a result of the conduct, acts, or omissions described in this Complaint.

50. As a direct and proximate result of these Defendants' actions, as detailed above, Domenic Dover suffered physical injury, emotional distress, as well as other economic and non-economic damages.

51. The injuries suffered by Domenic Dover were all preventable had Defendants not engaged in conduct which violated his fundamental rights.

52. Defendant Cuyahoga County ("the County") is responsible for the Cuyahoga County Corrections Center (CCCC), including the care and treatment of Detainees/Inmates—like Domenic Dover—in custody therein. The County is

required to ensure that the policies, practices, and customs of the CCCC comply with federal and Ohio law concerning the treatment of persons in custody.

53.     Unconstitutional and deplorable conditions in the CCCC are a historic problem. Defendants have long been on notice of—and have even taken action to worsen—these conditions and have long been on notice of the incompetent supervision and management of the CCCC.

54.     The CCCC has been subjected to federal court monitoring at least twice in response to unconstitutional conditions of confinement within the jail.

55.     The County's track record of operating the CCCC demonstrates longstanding, systematically unconstitutional operational procedures.

56.     CCCC today operates in complete crisis. Upon information and belief, at least nine people have died in CCCC since 2018, including Domenic Dover, and over 55 people attempted suicide while in CCCC custody in 2018. The rates of in-custody deaths, assaults by correctional officers, deprivations of basic human rights, and safety of Detainees/Inmates and staff alike have all reached emergency levels.

57.     It has been reported that, after each death, someone confiscated the housing unit logs from the time of the death and replaced them with new logs.

58.     Detainees/Inmates and their families have raised innumerable concerns and complaints about deplorable conditions. Some CCCC staff have quit their jobs in protest. Other stakeholders, including judges in the Cleveland Municipal

Court and Cuyahoga Common Pleas Court, have expressed serious concern over jail conditions and the manner in which the facility is being operated.

59.     As of November 2017, the Ohio Department of Rehabilitation and Corrections (ODRC) Bureau of Adult Detention inspection found CCCC was not in compliance with Ohio's Minimum Standards for Adult Detention Centers.

60.     Likewise, the Pretrial Justice Institute (PJI) found in 2017 that CCCC was overcrowded. The PJI report found that on average, CCCC has been operating at over 100% capacity for four of the past five years. (*See* Pretrial Justice Institute, "Enhancing Pretrial Justice in Cuyahoga County: Results from a Jail Population Analysis and Judicial Feedback," September 2017.

61.     Further, the Cuyahoga County Bail Task Force found in March 2018, that Inmates/Detainees remain in CCCC custody for unnecessarily long periods of time.

62.     The County has long been on notice of overcrowding and medical and mental health issues—since at least 2017—but has not remedied this critical problem and instead has increased overcrowding.

63.     Further, as indicated, the United States Marshals Service (USMS) issued a report on November 21, 2018, condemning the conditions in the CCCC. This report documented numerous failings discovered in USMS's thorough review of conditions, policies, and practices at CCCC. The report concluded that conditions in CCCC are inhumane and dangerous for both Inmates/Detainees and corrections officers.

64.     The USMS Report found the CCCC deficient in, *inter alia,* intake procedures, the provision of medical care, inmate abuses, violations of Constitutional rights, and other violations relevant to Domenic Dover's claims.

65.     The USMS report found that CCCC is severely overcrowded and identified 96 corrections officer vacancies, indicating severe understaffing. The report states, "as a result of the high vacancy rate and excessive staff call outs, the CCCCs daily operation is greatly impacted regarding provision for detainees'/ inmates' basic needs."

66.     USMS's documentation of deficiencies in intake evaluations, medical care, and dangerously low understaffing is consistent with the experience of Domenic Dover.

67.     As evidenced in the USMS report and Plaintiffs' accounts, CCCC is in violation of the Ohio minimum jail standards, as defined in Ohio Admin. Code § 5120:1-8, pertaining to operation of full-service jails in the State of Ohio. Violations Ohio Admin. Code § 5120:1-8 include, but are not limited to:

-       Failure to arrange for all levels of health care, including initial screenings upon booking and including ongoing mental health care, and failure to assure quality, accessible, and timely services for inmates;

-       Failure to ensure that all health and mental health personnel are appropriately credentialed, with verification of current credentials on file at the facility;

-       Failure to provide a daily procedure whereby inmates have an opportunity to report medical and mental health complaints through health-trained personnel, or for urgent matters, to any jail employee, along with failure to provide a grievance system for medical and mental health treatment, where daily complaints and grievances are addressed in a timely manner, recorded and maintained on file, reviewed daily by a qualified health care personnel, and treatment or follow-up are provided as necessary; and

-       Failure to maintain accurate health/mental health records in written or electronic format.

### Former CCCC Official Removed Over Public Statements about Denial of Detainees'/Inmates' Access to Adequate Medical Care

68.     Gary Brack, former Director of Ambulatory Care at CCCC, spoke out against the conditions at CCCC at a May 2018, Cuyahoga County Council meeting. Brack blamed former Director of Regional Corrections Kenneth Mills "for meddling in jail healthcare, obstructing the hiring of nurses, and creating an unsafe environment for staff by scaling back security in the jail's medical unit." (*See* Adam Ferrise, "Ex-Cuyahoga County Jail Supervisor Subpoenaed to testify before Grand Jury,"

69.     Rather than launching an investigation into the medical care crisis at the CCCC or investigating whether Mills was fit to continue in the director position, Defendant Budish removed Gary Brack because Brack was outspoken and critical against Mills.

70.     County spokeswoman Mary Louise Madigan characterized this conflict, noting that "Armond [Budish] did have a meeting at Metro. It was clear that Mr. Brack and the jail director, Ken Mills, didn't work well together, and we asked that he not be returned to his position at the jail." (*See* Courtney Astolfi and Adam Ferrise, "Budish Personally Requested Ouster of County Jail's Medical Supervisor Who Criticized Jail Administration," *Cleveland.com* (Dec. 13, 2018), available at https://www.cleveland.com/metro/2018/12/budish-personally-requested-ouster-ofcuyahoga-county-jails-medical-supervisor-who-criticized-jail-administration-sources-say.html.

71.     After Brack's appearance at the May 2018, County Council meeting, at least seven inmates died in Cuyahoga County's custody within a span of barely four months, including inmates likely not receiving proper psychiatric and/or medical care.

72.     Defendant Cuyahoga County provided improperly redacted records concerning the deaths to members of the media. Though the County subsequently provided unredacted records, full records about these deaths have not been released to the media or the public. (*See* Adam Ferrise, "Death of Cuyahoga County Jail inmate subject of criminal investigation: What we know about 7 jail deaths," *Cleveland.com* (Nov. 21, 2018).

73.     Though County Executive Armond Budish has publicly stated that CCCC is the largest mental health provider in Ohio, upon information and belief, CCCC has not had a staff psychiatrist since April 2018, and only one nurse practitioner

administers mental health care 10 hours a day, four days a week. CCCC does not offer any mental health care for the rest of the time.

74. Lack of adequate staffing of corrections officers further exacerbates the denial of access to medical and mental health care because there are not sufficient corrections officers to escort Detainees/Inmates to and from the medical and mental health units.

75. In June 2018, a state inspector found that CCCC failed to complete required intake medical assessments within the legally required timeframe.

76. This delay results in Detainees/Inmates with serious mental health and medical needs being denied proper care and necessary medication and/or treatment when they enter CCCC facilities.

77. Marcus Harris, former jail nursing director, has also stated that inmates at the Euclid Jail, also run by Defendant Cuyahoga County under regionalization of jail operations, often did not receive the required initial medical assessment upon booking, leaving medical conditions unchecked for days.

78. In May 2018, Mr. Harris stated that he quit his job at CCCC in January amid inmate safety and ethics concerns. He believes the conditions at CCCC were so unsafe that "every day when [he] went to work [he] had to wonder if someone was going to be dead or assaulted." (*See* Courtney Astolfi, "Inmates deprived of proper medical care under Cuyahoga County jail director, former nursing supervisor says," *Cleveland.com* (May 31, 2018).

79.     Compounding medical and mental health issues, CCCC regularly denies Detainees/Inmates access to necessary hygiene products, including sanitary pads and soap, and access to sufficient cleaning supplies to attempt to keep their own living areas, bedding, and clothing clean and sanitary.

80.     Defendants lack adequate policies, practices, training, and supervision for staff concerning how to respond to detainees/inmates having drug intoxication.

81.     Also relevant is the Cuyahoga County Agency of Inspector General, "Cuyahoga County Corrections Center Report of Investigation, February 12, 2019" by Mark D. Griffin.

82.     In the Inspector General's report, evidence of inadequate staffing; the unlawful practice of "Red Zoning"; inadequate correctional staffing; inadequate housing; inadequate mental health care; inadequate physical health care; the failure to provide medications; inadequate health care staff; failures related to performing health care assessments; deceptive, fraudulent and inaccurate record keeping relative to work assignments, inmate health care records, mental health assessments, physical health assessments, and incidents of violations of inmates rights; the destruction of public records and evidence related to inmate rights and well-being; and other systemic failures - all stemming from Cuyahoga County's unlawful customs, policies and practices, is laid bare.   Many of these violations stemmed from the decision to regionalize the Cuyahoga County Corrections Center *and* stemmed from the administrative decision to profit off of the inmates at the expense of their health, well-being and rights.

83.     All of these issues were matters covered in the criminal case against former CCCC Director, Mr. Kenneth Mills in the case, *State of Ohio v. Mills,* Cuyahoga County Court of Common Pleas, Case No.: CR-19-645266.   In Mr. Mills trial, evidence was presented of unlawful policies, customs, and practices in relation to the problems set forth herein.   Evidence was specifically presented which demonstrated how the intake process at the CCCC, as well as their record keeping, was below legal standards.   The failure to provide mental health assessments, medications, proper supervision, punishing inmates with health concerns instead of providing them treatment, inadequate training relative to suicide prevention and health assessments were all part of what was presented to a jury.  These issues, as set forth herein, persisted in the CCCC such that these same problems were in existence when Plaintiff was incarcerated at the CCCC in July, 2019.  See also the 2019 ODRC investigation relative to the CCCC as authored by ODRC Investigator and witness in the Mills trial, Mr. Joel Commins, attached hereto as Exhibit 2.


## FIRST CAUSE OF ACTION
### 42 U.S.C. § 1983 Against Defendants for Deliberate Indifference to Serious Medical Needs in Violation of the Eighth and/or Fourteenth Amendment

84.     Preceding paragraphs are incorporated by reference herein as if fully rewritten.

85.     The Defendants observed Domenic Dover and objectively knew he was in a state of mental and emotional breakdown.   Cuyahoga County was on actual notice of Domenic Dover's physical symptoms, diminished mental functioning, and the fact that he was suicidal and needed mental health intervention as well as his prescribed mental health medications.

86.     These Defendants were put on actual notice that Domenic Dover was in the throes of a physical crisis.   Domenic Dover was also clearly experiencing a mental health crisis.

87.     Defendants knew, both by report and by observation, that Domenic Dover required immediate psychiatric intervention and hospitalization for his condition.

88.     Domenic Dover was entitled to care and treatment for his serious medical condition.

89.     Defendants callously failed to respond to Domenic Dover's medical condition and need for emergency psychiatric intervention and medications.

90.     None of these Defendants, despite their legal duties, responded to Domenic Dover's emergency medical needs.

91.     Rather, and based on the facts set forth herein, these Defendants delayed and therefore interfered with Domenic Dover obtaining necessary and life-saving medical care.   As such, their conduct in this regard was willful, wanton, reckless, and malicious as well as a violation of his Constitutional rights.

92. Defendants were therefore deliberately indifferent to Domenic Dover's serious medical needs in violation of his rights as protected by the Eighth and/or Fourteenth Amendments to the United States Constitution.

## SECOND CAUSE OF ACTION
### (42 U.S.C. § 1983 Supervisory Liability Against Defendants)

93. Preceding paragraphs are incorporated by reference herein as if fully rewritten.

94. Defendants Budish, Gibson, Mills, Ivey, Tallman, Sgt. Kelly, MetroHealth and Cuyahoga County (the supervisory Defendants) are liable in their role as supervisors.

95. As alleged herein, Domenic Dover's rights were violated by Cuyahoga County and MetroHealth Defendants as outlined herein.

96.  The supervisory Defendants were personally involved in the violation of Domenic Dover's rights by, among other acts:

    i.    Directly participating in the conduct of subordinate Defendants by acquiescing to and failing to intervene to correct the actions of the subordinates once it was known that these actions were occurring;

    ii.    Failing to train their subordinates, including these named Defendants, on topics including but not limited to engaging in crisis interventions, interacting with suicidal, depressed and/or bipolar individuals or individuals who they know or have reason to believe are experiencing the ill effects of a mental health crisis and other topics relevant and set forth herein when the need for additional training was apparent throughout their actions and inactions, creating a policy, practice, or custom in which violations occurred;

iii.     Consistently failing to supervise and train their subordinates, including these named Defendants, such that the violation of a citizen's rights were highly predictable under the usual and recurring circumstances and did occur against Domenic Dover in the manner predicted;

iv.     Remaining deliberately indifferent to and consciously disregarding the rights of citizens and civilians by failing to act on information that Constitutional rights were being violated.

97.     The supervisory Defendants' failures to supervise and train, and their participation in the conduct of their subordinates was affirmatively linked to the violations of Domenic Dover's state and federally protected rights.

98.     The supervisory Defendants' also failed to correct the unlawful policies, procedures and customs which had been in existence prior to Plaintiff's incarceration, despite having notice of said conditions and problems, as well as the opportunity and ability to correct such problems.

99.     As a direct and proximate result of the supervisory Defendants' failure to supervise and train their subordinates, and in participating in their course of conduct, Domenic Dover was forced to endure and suffer severe physical, mental and emotional injuries.

100.     In failing to train and supervise and by participating in their subordinates' conduct, the supervisory Defendants acted wantonly, willfully, recklessly, maliciously, without legal justification, and with deliberate indifference to Domenic Dover's federally protected rights warranting the imposition of exemplary punitive damages.

## THIRD CAUSE OF ACTION
## (Willful, Wanton, Reckless, Malicious, and Bad Faith Conduct Against Defendants)

101.    Preceding paragraphs are incorporated by reference herein as if fully rewritten.

102.    As set forth herein, the Defendants failed to exercise due care and acted in a willful, wanton, reckless, malicious, and/or in bad faith manner while acting in the course and scope of their employment and under color of law which culminated in the attempted suicide of Domenic Dover such that they are not entitled to the defenses and immunities for negligent conduct as set forth in O.R.C. §2744.01 *et seq.*

*103.*    The Defendants failed to recognize and/or ignored the fact that Domenic Dover was experiencing an emergency mental health crisis and needed immediate medical attention. They failed to intervene on behalf of Domenic Dover despite appreciating his serious medical needs and having the opportunity to intervene on his behalf, and they also took ill-advised steps which were contrary to training and procedures.    They failed to provide suicide prevention assistance and other emergency medical care.    They took steps which hindered the provision of medical care.    They failed, in one way or another, to protect Domenic Dover's civil rights and/or to prevent his rights from being violated.    These mistakes and other mistakes as set forth herein were made in a wanton, willful, reckless, and/or malicious manner.

*104.* The failure of these Defendants to treat Domenic Dover's medical emergency is what led to him suffering bodily harm and emotional distress.

*105.* As a direct and proximate result of these Defendants' acts and omissions as set forth herein, Domenic Dover suffered severe physical injuries, emotional and mental distress.

## FOURTH CAUSE OF ACTION
### (Intentional Infliction of Emotional Distress Against Defendants)

106. Preceding paragraphs are incorporated by reference herein as if fully rewritten.

107. Defendants either intended to cause emotional distress or knew or should have known that their actions would result in serious emotional distress to Domenic Dover.

108. These Defendants engaged in conduct so outrageous as to go beyond all possible bounds of decency and was utterly intolerable in a civil society.

109. As set forth herein, Plaintiff's repeated pleas for mental health services, including a need to be assessed, for medication, and for his threats of suicide to be taken seriously and considered, were ignored. In the midst of a mental health crisis, and having been ignored, unreasonably disciplined for asking for help, and being disregarded, Plaintiff attempted suicide in a state of dispair directly stemming from the defendants' unlawful and callous behavior.

110. As a direct and proximate result of these Defendants' actions and inactions, Domenic Dover suffered psychic injury prior to and after his suicide

attempt; and the mental anguish suffered by Domenic Dover was serious and of a nature that no reasonable person could be expected to endure.

111. These Defendants' infliction of emotional distress was also willful, wanton, reckless, malicious, and/or in bad faith.

**FIFTH CAUSE OF ACTION**
**(Negligent Hiring, Training, Retention, Discipline and Supervision)**

112. Preceding paragraphs are incorporated by reference herein as if fully rewritten.

113. Defendants Tallman and MetroHealth employed and/or supervised the non-supervisory Defendants and knew or should have known that these employees had a propensity for failing to provide medical care, failing to provide adequate medical care, failing to perform intake evaluations, failing to perform meaningful health screenings and evaluations, not intervening on behalf of inmates when there is both the need and the legal duty to do so, destroying evidence, misleading other officials in their analysis of the Cuyahoga County Jail, and acting with deliberate indifference to the serious medical needs of individuals under their care, custody, and control, and otherwise acting or failing to act in an appropriate manner consistent with their legal duties in situations similar to the one they faced with Domenic Dover.

114. Defendants Tallman and MetroHealth also failed to adequately train these employees relative to providing adequate medical care, performing intake evaluations, performing meaningful health screenings and evaluations,

intervening on behalf of an inmate, recognizing emergency conditions, destroying evidence, misleading other officials in their evaluation of the Cuyahoga County Jail, and acting with deliberate indifference to the serious medical needs of individual and other areas of training relevant to the matter herein which on their face were violative of the Fourth, Eighth and/or Fourteenth Amendment and otherwise acting in an appropriate manner consistent with their legal duties in situations similar to the one they faced with Domenic Dover and further was the direct and proximate cause of Domenic Dover's severe physical pain as well as emotional and mental.

### SIXTH CAUSE OF ACTION
#### (Failure to Intervene)

115.    Preceding paragraphs are incorporated by reference herein as if fully rewritten.

116.    Defendants as set forth herein all had the opportunity as well as the legal duty to intervene on behalf of Domenic Dover so as to prevent his rights from being violated, or to curtail the violation of his rights.

117.    Each of these Defendants failed in this regard and are therefore liable.

118.    As set forth in the statement of facts, when various CCCC C.O.s and or Deputys interacted with Plaintiff, they were in the presence of other staff and/or defendants who were violating Plaintiff's rights and/or acting in an unlawful manner.  These Defendants, in addition to failing in their duties, failed to prevent Plaintiff from being punished (handcuffed, sent to isolation, etc.) despite having

the opportunity and legal duty to do so. The named defendants as set forth in Plaintiff's statement of facts also presented Plaintiff to medical staff where they observed Plaintiff being denied his right to adequate medical care. Cuyahoga County jail staff, and MetroHealth/Nursing staff observed these denials and had the duty and opportunity to intervene on Plaintiff's behalf but none of them did so. The defendants who failed to intervene as set forth herein include but are not limited to defendants Bitterman, Harris, Shaw, Reeves, White, Soucie, Newsome, Thomas, and Robles.

119.    These Defendants actions and inactions were under color of law and deprived Domenic Dover of federally protected rights.

120.    These Defendants actions and inactions were willful, wanton, reckless and/or malicious.

121.    As a direct and proximate result of the wrongful acts and omissions as set forth herein, these Defendants caused Domenic Dover to suffer extreme physical pain as well as severe mental and emotional distress.

**SEVENTH CAUSE OF ACTION**
**(14TH DUE PROCESS)**

122.     Preceding paragraphs are incorporated herein by reference as if fully rewritten.

123.     The facts as set forth herein establish that Domenic Dover, an individual with diagnosed mental health conditions, was in a special relationship with the Defendants within the meaning of the case law interpreting 42 U.S.C. §1983 and

the Fourteenth Amendment, which guarantees equal protection of the laws and prohibits any person acting under color of law from subjecting any person in custody to punitive conditions of confinement without due process of law.

124.    Defendants, acting under the color of law, intentionally and with conscious, callous, and unreasonable indifference deprived Domenic Dover of his constitutional rights to due process and equal protection.

125.    The Defendants' conduct, as described herein, their acts and/or omissions constituted deliberate indifference to Domenic Dover's medical needs, was unreasonable and violated his rights under the Fourteenth Amendment to the United States Constitution to due process of law and equal protection and therefore violated 42 U.S.C. §1983.

126.    Defendants' conduct, as described herein, their acts and/or omissions were the direct and proximate cause of the violations of Domenic Dover's Fourteenth Amendment rights, his mental suffering, anguish and other injuries.

127.    Defendants are jointly and severally liable for this conduct.


**EIGHTH CAUSE OF ACTION**
**(Americans with Disabilities Act and Section 504 Claim)**

128.    Preceding paragraphs are incorporated herein by reference as if fully rewritten.

129.    Defendant CCCC and/or MetroHealth is and has been a recipient of federal funds, and is covered by the mandate of Section 504 of the 1973 Rehabilitation Act (29 U.S.C. §794).    Section 504 requires that persons with

disabilities be reasonably accommodated in their facilities, program activities, and services and reasonably modify such facilities, services and programs to accomplish this purpose.

130. Further, Title II of the Americans with Disabilities Act (42 U.S.C. §§12131-12134) applies to Defendant Cuyahoga County and/or MetroHealth and has essentially the same mandate as that expressed in §504.

131. The CCCC is a facility and its operations comprises a program and service for §504 and Title II purposes.

132. Defendants Cuyahoga County and/or MetroHealth failed and refused to reasonably accommodate Domenic Dover's mental health conditions and disabilities and to modify their jail facilities, operations, services, accommodations and programs to reasonably accommodate his disability in violation of Title II of the ADA and/or §504 when he was in their custody.

133. Defendants' failures directly and proximately caused Domenic Dover's pain, injuries and damages. Defendants' violations of the ADA and/or §504 were the specific proximate cause of his pain, injuries and damages.

134. Defendants are jointly and severally liable for this conduct.

### NINTH CAUSE OF ACTION
### (§1983 *Monell* Claim Against Defendant Cuyahoga County and/or MetroHealth)

135. Preceding paragraphs are incorporated herein by reference as if fully rewritten.

136.    The actions of the Defendants were taken pursuant to one or more interrelated *de facto* as well as explicit policies, practices and/or customs of Defendant Cuyahoga County, its officers, agents and/or officials.

137.    The actions of the Defendants were also taken pursuant to one or more interrelated *de facto* as well as explicit policies, practices and/or customs of Defendant MetroHealth, its officers, agents and/or officials.

138.    Defendant Cuyahoga County, acting at the level of official custom, policy, practice and custom, with deliberate, callous, conscious, and unreasonable indifference to Domenic Dover' constitutional rights, authorized, tolerated, and institutionalized the practices and ratified the illegal conduct herein described, and at all times material to this Complaint, the Defendant Cuyahoga County, MetroHealth, and/or CCCC, its agents and/or officials had interrelated *de facto* policies, practices, and customs which included but were not limited to:

-       Failing to properly train, supervise, discipline, transfer, monitor, counsel and otherwise control corrections officer, health care providers and other jail staff;

-       Failing to appropriately and timely identify serious mental health medical issues and the needs of pre-trial detainees in a state of mental health crisis such as Domenic Dover;

-       Failing to appropriately recognize suicidal ideations and tendencies in pre-trial detainees such as Domenic Dover despite objectively clear and obvious indications of mental health issues and a propensity to engage in self-harm;

- Failing to timely refer pre-trial detainees such as Domenic Dover to appropriate mental health providers and for mental health services despite an objectively clear and serious need;

- Failing to segregate pre-trial detainees such as Domenic Dover from the general population and place them on suicide watch and implement suicide precautions, including but not limited to providing such inmates with anti-suicide blankets or, at a minimum, not providing such inmates with the means and mechanism by which they could harm themselves;

- Failing to timely and adequately communicate critical information regarding pre-trial detainees such as Domenic Dover and who are experiencing a mental health crisis regarding their mental health conditions and the risk of suicide;

- Failing to provide pre-trial detainees suffering from mental health issues such as Domenic Dover with appropriate medications despite being informed of the medications and the need to provide them;

- Ignoring such obvious signs of suicidal ideations, tendencies and other mental health crisis such as a recent suicide attempt and inmates presenting with injuries reflecting or suggesting self-harm;

- Failing and refusing to correct, discipline, and follow-up on deficiencies noted in the care, treatment and/o supervision of detainees with mental health issues or other health crises such as Domenic Dover;

\-      Possessing knowledge of deficiencies in the policies, practices, customs and procedures concerning detainees, and approving and/or ratifying and/or deliberately turning a blind eye to those deficiencies.

139.     Specifically, CCCC personnel, correctional officers, health care personnel, and other jail employees are not properly trained relative to performing an intake, assessing new inmates, screening inmates for mental and physical health issues, identifying inmates with health issues, referring and/or dealing with inmates with mental health issues including but not limited to suicidal ideations and/or tendencies, and protecting or intervening on behalf of inmates with mental health issues and/or suicidal ideations to protect them from harm.

140.     These policies, practices, procedures and customs as set forth herein both individually and together were maintained and implemented unreasonably and with deliberate indifference.

141.     These policies, practices, procedures and customs as set forth herein both individually and together were encouraged, ratified, and permitted to become part of the accepted practices at the CCCC, and these included but were not limited to failing to adequately observe detainees to identify problematic behavior such as self-harm, failing to adequately screen detainees for mental health issues and further failing to process what information was obtained, failing to appreciate the import of a recent suicide attempt as well as diagnoses of mental health issues and the inmates taking and need to continue taking prescription medication related to his mental health and the avoidance of self-harming behaviors, failing to respond

to the express request for mental health treatment and for suicide prevention measures, failing to ensure that floor cards were not mislabeled, mishandled, forged or otherwise mismanaged such that the failure to manage to floor card system would serve to preclude detainees/inmates from obtaining the mental health or other health treatment they needed.

142.    Further, the Constitutional violations and damages to Domenic Dover that occurred as described herein were directly and proximately caused by the unofficial and/or official, tacit and/or expressed policies, customs, and practices; and otherwise unconstitutional policies of authorized policy makers of the Defendants who deliberately ignored detainees being subjected to unreasonable risk of harm, deliberately ignored violations of appropriate intake and screening procedures, and deliberately failed to supervise and control correctional officers, health care providers and other jail staff so as to prevent a violation of detainees' rights.

143.    These interrelated policies, practices, procedures and practices, as set forth herein, both individually and together, were maintained and implemented unreasonably and with deliberate indifference; and, encouraged the Defendants to commit the aforementioned acts and omissions relative to Domenic Dover and therefore were the direct and proximate causes of the Constitutional violations set forth herein which ultimately resulted in Domenic Dover attempting suicide and suffering pain, anquish and mental and emotional distress.

## TENTH CAUSE OF ACTION
### (MetroHealth: Vicarious Liability/*Respondeat Superior*)

144.    Preceding paragraphs are incorporated herein by reference as if fully rewritten.

145.     Defendant MetroHealth is vicariously liable for some or all of the actions, omissions, and conduct of its officers, representatives, employees, agents, and/or servants as set forth in the preceding paragraphs of this Complaint and under the doctrine of *respondeat superior.*

## DAMAGES

146.    Paragraphs 1 through 146 are incorporated by reference herein as if fully rewritten.

147.    As a direct and proximate result of the Defendants' acts, omissions, and misconduct, Domenic Dover suffered physical injury, pain, suffering, mental and emotional damage and other damages and other economic and non-economic losses.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff Domenic Dover prays for judgment against the Defendants, jointly and severally, for:

(A)    Compensatory and consequential damages for all the injuries, damages and losses identified in an amount to be determined by the Court and in excess of Twenty-Five Thousand dollars ($25,000.00);

(B)     Punitive damages in an amount to be determined at trial for the willful, wanton, reckless and malicious conduct of the individually named Cuyahoga County and MetroHealth Defendants;

(C)     Declaratory and injunctive relief against Cuyahoga County enjoining unlawful policies, practices, procedures and customs and ordering the institution of policies, practices, procedures and training for the Cuyahoga County Corrections Center to bring them into compliance with Constitutional standards;

(E)     Declaratory and injunctive relief against MetroHealth enjoining unlawful policies, practices, procedures and customs and ordering the institution of policies, practices, procedures and training for MetroHealth to bring them into compliance with Constitutional standards;

(F)     Attorneys' fees and the costs of this action and other costs that may be associated with this action; and

(G)     Any and all other relief this Court deems equitable, necessary, and just.

Respectfully Submitted,

The Law Office of Paul J. Cristallo

*/s/ Paul J. Cristallo*                .
PAUL J. CRISTALLO (0061820)
The Brownhoist Building
4403 St. Clair Avenue
Cleveland, OH  44103
T:  440-478-5262
F:  216-881-3928
E:  paul@cristallolaw.com
Lead Counsel for Plaintiff Domenic Dover

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.


_/s/ Paul J. Cristallo_                    .
PAUL J. CRISTALLO (0061820)
Counsel for Plaintiff Domenic Dover